**Mike APFFEL, et al., Plaintiffs,**

v.

**Robert HUDDLESTON,
et al., Defendants.**

**No. 2:98–CV–0496–S.**

United States District Court,
D. Utah,
Central Division.

May 27, 1999.

Kathryn Collard, Law Firm of Kathryn Collard, L.C., Salt Lake City, UT, for plaintiffs.

Dan R. Larsen, Utah Attorney General's Office, Salt Lake City, UT, for defendants.

## MEMORANDUM DECISION

SAM, Chief Judge.

### BACKGROUND

This action arises out of the death of an 18 year-old Dixie College freshman, Jason Apffel, on September 24, 1996. Apffel was from California and was a new student at Dixie College when he attended a party for incoming freshman called the "Sandblast". The activity was held near the South entrance to Snow Canyon State Park. While attending the party he climbed the sandstone cliffs which are near the area and fell to his death. Plaintiffs allege defendants had personal knowledge of the extreme danger posed by climbing the sandstone cliffs and hence defendants' planning of the party in the area was in wilful disregard for the safety of "out-of-state," and therefore uninformed and unprepared, students who would be attending the party and be attracted to the cliffs. Plaintiffs' claims are against Robert Huddleston, the president of Dixie College, personally; Don Reid, the director of campus security and the campus police department, personally; John Ibach, the manager of Snow Canyon State Park, personally; and another individual, Mike Reynolds, who was presumably a security officer, although he is not identified in the "Parties" section of the complaint.

Plaintiffs' claims for relief fall under the Fourteenth Amendment to the United States Constitution, the common law and the wrongful death and survival statutes of the State of Utah, Utah Code Ann. §§ 78–11–6, 17–11–7 and 78–11–12.

Defendants have moved to dismiss plaintiff's complaint pursuant to Fed.R.Civ.P. 12(b)(6). Defendants argue that plaintiffs fail to state a federal claim under the Fourteenth Amendment; plaintiffs' federal claims are barred by the doctrine of qualified immunity; plaintiffs fail to state a state law negligence claim; and plaintiffs' claims are barred under the Utah Governmental Immunity Act.

## ANALYSIS

**Standard of review applicable to plaintiffs' complaint.**

The first issue for determination by the court is whether the plaintiffs' complaint is held to the general standard of Fed.R.Civ.P. 8(a) which requires only "a short and plain statement of the claim," or whether there is a heightened pleading standard required once the affirmative defense of qualified immunity is raised. Plaintiffs rely on *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), which held that there is no heightened pleading standard in **municipal liability** cases under § 1983, to support their position that the general standard of Rule 8(a) should apply. However, as plaintiffs acknowledge and defendants are quick to point out, the *Leatherman* Court left open the question of "whether qualified immunity jurisprudence would require a heightened pleading in cases [like the instant matter] involving individual government officials." *Id.* at 167, 113 S.Ct. 1160.

Whether qualified immunity jurisprudence requires a heightened pleading standard where claims are made against individual government officials has been addressed, and the question answered by the Tenth Circuit in *Dill v. City of Ed-*

*mond, Oklahoma,* 155 F.3d 1193, 1204 (10th Cir.1998).

In the context of a 12(b)(6) motion to dismiss, our review of the qualified immunity defense is limited to the pleadings. See Gagan v. Norton, 35 F.3d 1473, 1475 (10th Cir.1994). We must construe the allegations in the complaint and any reasonable inferences to be drawn from them, in favor of Plaintiff. Breidenbach v. Bolish, 126 F.3d 1288, 1292 (10th Cir.1997). Where a qualified immunity defense is asserted in a 12(b)(6) motion, however, we apply a heightened pleading standard, requiring the complaint to contain "specific, non-conclusory allegations of fact sufficient to allow the district court to determine that those facts, if proved, demonstrate that the actions taken were not objectively reasonable in light of clearly established law." Id. at 1293. After the defense is raised, Plaintiff may amend his complaint to include additional "specific, non-conclusory allegations of fact" sufficient to allow the district court to determine whether Defendants are entitled to qualified immunity. Id. In this case, Plaintiff stood on his original complaint and the district court's grant of qualified immunity was based solely on the allegations set forth therein and the arguments raised in the parties' briefs.

*Id.* As in *Dill,* plaintiffs in the case before this court did not chose to amend their complaint after the qualified immunity defense was raised. Hence, the allegations contained in the original complaint are the allegations before the court for review.

**Whether the complaint states a cognizable substantive due process claim.**

The Fourteenth Amendment is phrased as a limitation on the State's power to act; not as a guarantee of certain minimal levels of safety and security. *See DeShaney v. Winnebago,* 489 U.S. 189, 194–195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). There are two exceptions to this rule, however: 1) where a "special relationship" exists between the state and the

individual; and 2) where there is a "state-created-danger." *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir.1995). Plaintiffs have argued both theories of liability.

■ The court will first address the "special relationship" exception. The general question of whether university school officials and students have a "special relationship" such that there is an affirmative duty to protect and keep free from foreseeable harm in connection with off-campus, extracurricular activities has not been addressed by the United States Supreme Court. In other contexts it has been made clear that an affirmative duty to provide protection to the individual exists only "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety...." *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998. *See also Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (state must provide adequate medical care to prisoners); *Youngberg v. Romeo*, 457 U.S. 307, 314–25, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (state must protect involuntarily committed mental patients); *Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (state has obligation to care for individuals injured while being apprehended by police); *Maldonado v. Josey*, 975 F.2d 727, 730 (10th Cir.1992) (state compulsory school attendance law did not give rise under the Due Process Clause to an affirmative duty to protect school children who attend state-run schools from constitutional deprivations by private actors **because children are still under care and supervision of parents, not state**).

In support of their claim that a "special relationship" was present between plaintiffs and defendants, plaintiffs argue that a contractual relationship existed between the decedent's parents and defendants because the Apffel's paid tuition and fees to Dixie College. Plaintiffs claim that aris-

ing out of this contractual relationship was an implied-in-fact agreement that defendants would conduct student activities in a reasonably safe environment and manner, particularly since decedent's parents were out of state and unable to personally care for their son. Plaintiffs cite to *Hartman v. Bethany College*, 778 F.Supp. 286, 291 (N.D.W.Va.1991) for support; however, their reliance is misplaced. *Hartman* specifically recognizes that the general obligation colleges have to students to maintain a campus environment free of foreseeable harm "has not been extended to non-curricular activities taking place beyond campus boundaries." *Id.* at 291.

Furthermore, the court found no cases which would support finding a "special relationship" which justifies imposing § 1983 liability on college officials arising out of an implied-in-fact contract to protect college students from injury during extracurricular off-campus activities. To the contrary, there are many cases, including Tenth Circuit precedent, which support a conclusion that no special relationship is created in such situations solely by virtue of the student/university relationship. *See Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1996) (no "special relationship" exists between public school officials and students by virtue of a state's compulsory attendance laws since a child and parent can still care for the child's needs); *Maldonado v. Josey*, 975 F.2d 727 (10th Cir.1992) (state compulsory attendance laws did not give rise under the Due Process Clause to affirmative duty to protect); *Orr v. Brigham Young University*, 960 F.Supp. 1522 (D.Utah 1994) (no special relationship existed between student football player and university since the relationship was not custodial in nature and the player retained his free will and independence). Finally, the court finds the facts and legal analysis contained in *Beach v. University of Utah*, 726 P.2d 413 (Utah 1986) highly relevant and its holding persuasive.

The Utah Supreme court held in *Beach* that there was no "special relationship"

between the university and an intoxicated student injured on a university-sponsored field trip sufficient to trigger an affirmative duty to protect. Beach attempted to rely on the university's knowledge of a previous incident involving drinking while on a field trip to create a special duty to supervise her on the evening in question. The court determined that such knowledge created no special duty. Of equal significance to the matter before this court, was the Utah court's dismantling of Beaches claim that a university has a "custodial relationship with its adult students and that this relationship imposes upon it the duty to prevent students from violating liquor control laws whenever those students are involved directly or indirectly in a University activity." *Id.* at 417–18.

Colleges and universities are educational institutions, not custodial. The students who attend these institutions of higher education are generally adults, as was decedent. Just as the plaintiff in *Beach*, Jason Apffel had the constitutional right to vote, U.S. Const. amend. XXVI, §. 1, he was chargeable on his contracts, Utah Code Ann., §§ 15–2–1 and 2 (1996), and if he had committed a crime, he would have been tried and sentenced as an adult. Utah Code Ann., § 78–3a–103 and 104. *See Beach*, 726 P.2d at 418. Furthermore, society, motivated by the demands of the students themselves, has ceased to recognize students as children requiring or needing constant supervision. *See Bradshaw v. Rawlings*, 612 F.2d 135 (3d Cir. 1979). To the contrary, the role of the post-secondary institution has become to "educate in a manner which will assist the graduate to perform well in the civic, community, family, and professional positions he or she may undertake in the future," not to babysit. *Beach*, 726 P.2d at 419. The following aptly summarizes the nature and effects of this transfer of power aptly:

> The transfer of prerogatives and rights from college administrators to the students is salubrious when seen in the context of a proper goal of postsecondary education—the maturation of the students. Only by giving them respon-

sibilities can students grow into responsible adulthood. Although the alleged lack of supervision had a disastrous result to this plaintiff, the overall policy of stimulating student growth is in the public interest.

*Baldwin v. Zoradi*, 123 Cal.App.3d 275, 291, 176 Cal.Rptr. 809, 818 (1981), cited in *Beach*, 726 P.2d at 419. *See also Hartman*, 778 F.Supp. at 293 (colleges do not stand in loco parentis to students, even though student was 17–year–old minor).

Turning to the facts of this case and the particular allegations of the complaint, decedent's status as an out-of-state freshman is insufficient to create a "special relationship" or an affirmative duty between plaintiffs and defendants. First, payment of tuition does not create a contractual relationship between parents and a college sufficient to trigger an affirmative duty to protect from injury during an extracurricular activity, without more. This issue was addressed and decided in *Beach* and the court is persuaded that the rationale of *Beach* is correct. *See also Orr*, 960 F.Supp. at 1526 (no "special relationship" existed between BYU and football player since the relationship was not custodial in nature and the player retained his free will and independence).

Second, no contract claim of any kind is plead in the complaint. On a motion under Rule 12(b)(6), the court must rely on plaintiffs allegations contained in the complaint and reasonable inferences to be drawn from them. Plaintiffs' memorandum in opposition to the motion to dismiss is not part of the complaint and cannot supplement or amend it.

Third, the complaint does not allege any specific contractual relationship between plaintiffs and the individually named defendants. At most, the payment of tuition is a contract for services with Dixie State College, not individual college or state park employees. As defendants have argued and the court agrees, plaintiffs cannot hold individual state officials personal-

ly liable for an implied-in-fact contract to which they were not a party.

Finally, notwithstanding the tragedy of Jason Apffel's accidental death, it is most persuasive to the court that Jason Apffel was an adult who made the independent decision to attend the Sandblast party and the independent decision to climb the sandstone cliffs. There is no allegation, nor facts plead from which this court can infer that his free will or ability to protect himself was ever impaired by the defendants. Under the facts plead it was neither the duty nor the right of these defendants nor any other state actors to protect Jason Apffel from himself or the obvious danger posed by climbing the cliffs.

Accordingly, the court finds there is no factual basis in the complaint and no legal authority to support plaintiffs' arguments that a "special relationship" existed between plaintiffs and defendants, by contract or otherwise, sufficient to create a legal duty on defendants' part to protect the decedent from the inherent danger of climbing sandstone cliffs. The court's holding is also influenced by persuasive policy arguments which support finding no "special relationship" exists between students and universities relative to off-campus non-curricular activities. *See Orr,* 960 F.Supp. at 1527–1528, ("We are loath to recognize a duty that is realistically incapable of performance or fundamentally at odds with the nature of the parties' relationship...."); *Hartman,* 778 F.Supp. at 294 (The concept of in loco parentis has been shaped based upon the societal realities of the time. In today's society neither parents nor students expect colleges to be surrogate parents.) (citing *Higgins v. Salt Lake County,* 855 P.2d 231, 236 (Utah 1993)).

■ However, finding that no "special relationship" existed between plaintiffs and defendants does not end the inquiry. As noted above, there is a second exception to the general rule that "state actors are generally only liable under the Due Process Clause for their own acts and not for private violence,".... *DeShaney,* 489 U.S.

at 196–197, 109 S.Ct. 998. Under the second exception, "[a] state ... may be liable for an individual's safety under a 'danger creation' theory if it created the danger that harmed that individual—that is, provided that the other elements of a § 1983 claim have been satisfied." *Uhlrig,* 64 F.3d at 572. Plaintiffs rely heavily on this exception in advancing their § 1983 claims against defendants.

■ The Tenth Circuit has given this court a definite standard to use when analyzing state-created-danger claims which may give rise to § 1983 liability.

[M] any state activities have the potential for creating some danger—as is true of most human endeavors—but not all such activities constitute a "special" danger giving rise to § 1983 liability. For the state to be liable under § 1983 for creating a special danger (i.e. where a third party other than a state actor causes the complained of injury), a plaintiff must allege a constitutionally cognizable danger. That is, the danger creation theory must ultimately rest on the specifics of a substantive due process claim—i.e. a claim predicated on reckless or intentional injury—causing state action which "shocks the conscience."

*Uhlrig,* 64 F.3d at 572 (citation omitted). The "shock the conscience" standard is given additional treatment by the Tenth Circuit in *Uhlrig* in the context of discussing *Collins v. City of Harker Heights Tex.,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). *Collins* involved the representative of a decedent suing a city for providing an unsafe workplace "when it caused a worker to enter a sewer without adequate ventilation and the worker died as a result." *Uhlrig,* 64 F.3d at 573, citations omitted. The Supreme Court ruled in *Collins* that the state actors did not violate the worker's substantive due process rights since "the Due Process Clause 'is not a guarantee against incorrect or ill-advised [government] decisions.' Nor does it guarantee municipal employees a workplace that is free of unreasonable risks of

harm." *Id.* (citations omitted). This underscores the known principle that careless or even negligent acts are not necessarily actionable under § 1983.

To assist in determining whether substantive due process rights have been violated by state action the Tenth Circuit provided the following guidance:

[W]e must bear in mind three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope, [citation omitted]; (2) the concern that § 1983 not replace state tort law, [citation omitted]; and (3) the need for deference to local policy making bodies in making decisions impacting upon public safety, [citation omitted]. Collins explained that the Due Process Clause's protection against "conscience shocking" conduct traditionally only involved deliberately wrongful government decisions rather than merely negligent government conduct. [Citation omitted]. Collins' focus on deliberateness coheres with our previous recognition that a § 1983 violation must be predicated on a state action manifesting one of two traditional forms of wrongful intent—that is, either: (1) an intent to harm: or (2) **an intent to place a person unreasonably at risk of harm.** [Citation omitted]. While "an intent to harm" follows the traditional tort law concept of intentionality, **we have defined "an intent to place a person unreasonably at risk" (or reckless conduct) as when a state actor "was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences."**

However, to satisfy the "shock the conscience standard, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." That is, **the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.**

*Id.* at 573–574 (emphasis added).[1]

It is now the task of the court to apply this standard to the facts plead in plaintiffs' complaint, keeping in mind that all well-pleaded facts must be taken as true and all facts must be construed in the light most favorable to the plaintiff. *Arnold v. McClain*, 926 F.2d 963, 965 (10th Cir. 1991). Having reviewed plaintiffs' complaint, the court finds the following facts must be accepted as true for the purpose immediately before the court:

A. Jason Apffel was a freshman student admitted to Dixie College in the Fall of 1996. He was from California, where his family resided.

B. On September 24, 1996 Mr. Apffel attended a party for incoming freshman. The party was held at an area in the vicinity of the Snow Canyon State Park's South Entrance.

C. While attending the party, Jason Apffel and another student attempted to climb sandstone cliffs located in Snow Canyon State Park. Jason Apffel fell to his death while attempting to descend the cliffs.

D. Defendants Robert Huddleston and John Ibach personally or through their designated agents jointly selected the location for the party.

E. The cliffs from which Jason Apffel fell are located along the South Entrance to the Snow Canyon State Park, the site of approximately eight (8) falls and near-falls in the three years immediately preceding

---

1. Plaintiffs do not allege that defendants intentionally harmed decedent, so, as in *Uhlrig*, we are dealing only with the second kind of cognizable intent under § 1983—that the state acted recklessly by deliberately placing decedent, an out-of-state freshman, unreasonably at risk of the known danger posed by the sandstone cliffs. Hence it is the bolded portions of the *Uhlrig* cite which are most relevant to the court's analysis.

Jason Apffel's fall, including a fall in September 1994, resulting in the death of a sixteen-year-old girl.

F. Defendants Huddleston and Ibach selected the location for the party knowing that numerous students from outside the geographical area would be attending and that these students would have no knowledge or appreciation for the danger posed by the cliffs, and further that these students would not be trained, equipped or supervised.

G. Defendant Huddleston failed to supervise and instruct defendants Reid and Reynolds (security personnel), who in turn failed to supervise the new students, and failed to warn or prevent them from climbing the cliffs during the party.

H. Defendant Ibach failed to provide adequate staff and supervision during the activity at Snow Canyon State Park or to warn students of the danger from climbing the cliffs or prevent students from climbing.

I. Defendants Don Reid and Mike Reynolds had personal knowledge of the recent, prior falls and near falls in the area where the activity was held. Despite that knowledge they failed to warn students, including Jason Apffel, failed to adequately supervise the students, and failed to prevent them from climbing the cliffs.

J. Defendants Reid and Reynolds watched Jason Apffel and another freshman student attending the party climb the cliffs in the area and took no action to warn these students of the danger posed by climbing the cliffs. Furthermore, these defendants took no action to supervise Mr. Apffel and the other climbers or to prevent them from climbing the cliffs.

Complaint at paras. 16–19, 21–25.

To discern whether the above plead facts make out a triable § 1983 claim, the court turns to *Armijo v. Wagon Mound Public Schools, et al.*, 159 F.3d 1253, 1262–63 (10th Cir.1998), and its application of a five-part test first articulated in *Uhlrig*.

> Plaintiff must demonstrate that (1) [Plaintiff] was a member of a limited and specifically definable group; (2) Defendants' conduct put [Plaintiff] ... at substantial risk of serious, immediate and proximate harm; (3) the risk was obvious or known; (4) Defendants acted recklessly in conscious disregard of that risk; **and** (5) such conduct, when viewed in total, is conscience shocking.

*Id.* [Emphasis added.].

*Id.*

Applying the above standard to the well-plead facts in plaintiffs' complaint the court can reasonably conclude that the first element of the five-part test is met—that decedent was a member of a limited and specifically definable group, i.e., out-of-state freshmen attending Dixie College. However, the court cannot find the second element has been met. Plaintiffs make conclusory allegations that planning the party in the vicinity of the cliffs put decedent at risk of serious harm. Plaintiffs' only support for the conclusory allegation is the reference to the eight falls and near-falls in recent years. However, the complaint provides no context for evaluation of the significance or relevance of the eight falls nor information regarding the circumstances surrounding the referenced falls. If thousands of people climb the cliffs each year, eight falls or near-falls may not be significant. Plaintiffs complaint simply falls short of providing sufficient facts from which the court can find that defendants conduct put plaintiffs at substantial risk of serious, immediate and proximate harm.

Part three of the test requires that "the risk was obvious or known." While the court accepts as true plaintiffs' allegation that defendants knew of the eight recent falls or near falls, since the court cannot find that defendants conduct put decedent at substantial risk, neither can the court

find sufficient facts plead to demonstrate that the risk was obvious or known to defendants. Knowing others have fallen in the past, is not the same as knowing that if defendants plan a party in the vicinity of the cliffs, students will leave the party, climb the cliffs and likely be injured. The opposite conclusion is just as likely. Perhaps parties have been planned in this vicinity on other occasions and no mishaps have occurred. Just as the court cannot conclude, based on the facts plead, that defendants have had no problems in the past, there are also insufficient facts plead from which the court cannot conclude that the risk to decedent was obvious or known.

Step four of the test analyzes whether "defendants acted recklessly in conscious disregard of [the] risk". As noted, the court cannot find from the facts plead that there was a substantial risk of serious harm to party participants. Further, even if defendants knew of the prior falls and near-falls, it requires a huge leap for the court to find that defendants acted recklessly in planning the party in the canyon near the cliffs. There are no allegations of previous mishaps at similar parties; there are no allegations involving the number of students who were lured away by the cliffs; there are no allegations that the cliff climbing was sanctioned or encouraged or that decedent's free-will was overcome by defendants in some way. Without more, the court cannot find that plaintiffs have plead facts from which the court or a reasonable jury could conclude that defendants' conduct was reckless or in conscious disregard of a known risk.

Finally, even if the court were able to find allegations which met the first four elements of the five-part test articulated in *Uhlrig*, and reiterated in *Armijo*, the facts plead do not come close to fulfilling the fifth and final part of the test for determining whether plaintiffs have plead a triable § 1983 claim. Defendants conduct, when viewed in total, was not conscious shocking. To plan a freshman party in a state park used regularly by the public for recreational activities is not conscious shocking.

The area in question is designated for precisely the use to which it was put by defendants. Furthermore, there is no allegation that climbing the cliffs was part of the intended or sanctioned activities. The most the court can glean from the complaint is that the party was near the cliffs and it was within the realm of possibility, perhaps even likely, that some students would be attracted to the cliffs. Even if so, courts have found the risks attendant to hiking and rock climbing to be so inherent and obvious that there is no duty to warn visitors to the area of the dangers. *See Johnson v. U.S. Dept. of Interior,* 949 F.2d 332, 337 (10th Cir.1991) (the inherent dangers of mountain climbing are patently obvious; it would be impractical if not impossible to test competency or monitor equipment use of climbers; Park Service's actions, as they relate to regulation of mountain climbing are shielded from judicial review by the discretionary function exception); *Kiehn v. United States,* 984 F.2d 1100, 1106 (10th Cir.1993) (Risks plaintiff took when he decided to climb a rock formation in Dinosaur National Monument were inherent and obvious. There is no statute, regulation or agency policy requiring the National Park Service "to place signs which warn people that scaling sandstone cliffs may be dangerous."). It is noteworthy that none of the cases cited in the briefs provide a caveat that uninformed or unprepared climbers are entitled to a warning or that such a status creates a heightened responsibility on the part of park officials. Such an exception to the rule that there is no duty to warn would be impractical and ill-advised, for it would simply be impossible for park officials to monitor the knowledge and skill of those using state and national parks, and further, it would be an infringement on the public's right to use these public areas.

Plaintiffs' claims fail the five-part test. In addition claims fail for another reason articulated in *Armijo*.

Although this five part test is correct, so far as it goes, it is not entirely complete

in light of the Supreme Court's decision in *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998, 103 L.Ed.2d 249. In DeShaney, the Court held that the State had not violated the Due Process Clause by returning a child to the custody of his abusive father, who then beat the child and caused him permanent brain damage. *Id.* Although the plaintiff in that case arguably met the five criteria set forth in Uhlrig, the Supreme Court held that the plaintiff's § 1983 claim must fail. Specifically, the DeShaney Court stated:

> While the State may have been aware of the dangers that [plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.... [I]t placed him in no worse position than that in which he would have been had it not acted at all.

*Id.* Thus, in addition to meeting Uhlrig's five-part test, a plaintiff must also show that the charged state entity and the charged individual defendant actors created the danger or increased the plaintiff's vulnerability to the danger in some way. In other words, if the danger to the plaintiff existed prior to the state's intervention, then even if the state put the plaintiff back in that same danger, the state would not be liable because it could not have created a danger that already existed.

> The key to the state-created danger cases ... lies in the state actors' culpable knowledge and conduct in affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid. Thus the environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's [acts] to occur.

*Johnson v. Dallas Ind. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir.1994) (internal citations and quotations omitted);....

*Armijo*, 159 F.3d at 1262–63 (quoting *Uhlrig*, 64 F.3d at 574).

It is persuasive to the court that the cliffs at issue are a natural condition on public land to which Jason Apffel had access at any time. Defendants did not create the cliffs nor the danger posed by climbing them. Furthermore, the court cannot find that the act of a planning a party on state lands near the sandstone cliffs enhanced the danger to decedent. The cases cited by defendants and referenced by the court in this decision compel a conclusion that neither the law as it existed at the time of the accident nor the facts plead in plaintiffs' complaint support finding that the state created the danger to decedent or enhanced the risks that were already in existence.

Accordingly, the court finds plaintiffs' have not plead facts from which a reasonable trier of fact could find a substantive due process violation. Defendants' motion to dismiss the § 1983 cause of action contained in plaintiffs' complaint is hereby granted.

**Defendants are entitled to qualified immunity.**

■ As an alternative basis for the court's granting the defendants' 12(b)(6) motion, the court finds defendants are entitled to qualified immunity in regard to plaintiffs' § 1983 claim. "Qualified immunity spares Defendants the burden of proceeding with the litigation unless Plaintiff can show that Defendants violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)." *Dill*, 155 F.3d at 1204.

As indicated throughout the memorandum decision, there are no cases cited by either plaintiffs or defendants which demonstrate that defendants had a "special relationship" with decedent or that defendants' planning and holding an extra-curricular college party in the state park in the area of the sandstone cliffs either created

a constitutional duty to protect, warn or prevent college students from climbing the cliffs, or that such an act put decedent at an unreasonable risk of known harm.

Plaintiffs' briefing illustrates only that the law surrounding the existence of the state-created-danger exception was well-established—a fact which no party contests. Thus, even though "*Armijo* makes plain, at the time of the incidents referred to in the case at bar, the law was 'clearly established' that a duty to protect arises where state officials act affirmatively in creating or enhancing the risk of danger to an individual that would not have existed otherwise", Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss at 31, that is only the first step in the analysis. Plaintiffs provided no facts or law from which the court could find, from the facts plead, that the actions of the state actors were contrary to clearly established law of which a reasonable person would have known. *See Harlow*, 457 U.S. at 818, 102 S.Ct. 2727.

Beyond making conclusory statements that defendants' actions were dangerous "[g]iven the facts and circumstances confronting defendants at the time of the incident", Plaintiffs' Opposition at 31, plaintiffs do not cite one analogous case or make one persuasive argument that "college and park officials had a constitutional duty to protect college students from natural hazards on public land during an extracurricular activity." Reply at 9–10. On the other hand, defendants cite several cases from which the court can conclude that, at best, the law was unsettled on whether a university owed a duty to its students relative to the dangers related to an extra-curricular activity in a state park near sandstone cliffs, and even more plausibly, that the law was clearly in favor of finding no duty to warn or protect students in this situation from the obvious, inherent dangers attendant to climbing sandstone cliffs. *See Johnson*, 949 F.2d at 337; *Kiehn*, 984 F.2d at 1106. Without more, the court is compelled to find that even if plaintiffs' had somehow plead a substantive due process violation, the law was not settled in sup-port of plaintiffs' position and defendants are entitled to qualified immunity against the § 1983 claim. Therefore, the court dismisses the § 1983 claim on this alternative basis as well.

Furthermore, as noted by defendants, the complaint fails to allege any specific, non-conclusory facts which establish a factual link between these individual defendants and decedent. The only link between the parties was the university/student relationship which neither imposed a duty upon defendants to protect decedent or others like him, nor allowed defendants to regulate the comings and going of Jason Apffel during an off-campus, extracurricular activity in a state park.

**Plaintiffs' state law negligence claim.**

Although not specifically identified as a negligence claim, plaintiffs' complaint makes reference to "the grossly negligent or negligent conduct" of defendants. Complaint at Para. 30. The court will therefore analyze plaintiffs' allegations within the context of a claim under the common law doctrine of negligence.

Plaintiffs have designated their claims to be against each defendant individually. The court will first address the pendant state claims accepting that designation at face value. Therefore, under well-established law, to prevail on their negligence claim it must be established that each defendant owed a duty to plaintiffs; that the duty was breached; that the breach by each defendant was the cause, both actually and proximately, of injury to the plaintiffs; and last that plaintiffs have been damaged as a result. *Williams v. Melby*, 699 P.2d 723, 726 (Utah 1985); *Lamarr v. Utah State Dept. of Transp.*, 828 P.2d 535, 537 (Utah App.1992).

It is uncontested that establishing each defendant owed plaintiffs a duty of care is an essential element of plaintiffs' negligence claim. Determination of whether the defendants owed plaintiffs any duty is "entirely a question of law to be determined by the court." *Lamarr*, 828 P.2d at

538. Careful review of the complaint compels the conclusion that defendants owed plaintiffs no duty of care.

 It has already been discussed by the court that the complaint fails to allege any relationship between each defendant and plaintiffs sufficient to create a "special relationship." The lack of any contractual relationship has also already been the subject of the court's decision—mere payment of tuition does not create a contractual relationship between parents and a college, *see Beach*, 726 P.2d 413; and no specific facts linking any of the defendants individually to plaintiffs have been plead. While plaintiffs have plead, and the court accepts as true, that defendants had personal knowledge of the eight falls and near-falls which had taken place in the three years preceding decedent's accident, it is not reasonable to take the analytical leap plaintiffs urge to next conclude that such knowledge created a special duty owed to decedent as an out-of-state freshman, without more.

The court simply cannot infer the omitted facts necessary to support a charge of negligence. There are no specific facts plead which create a duty to decedent. All plaintiffs have given the court are general allegations that decedent was part of a group that, because of its background, was not likely to have knowledge of the dangers of the cliffs nor experience in climbing. Even if that allegation had more specifically referenced decedent, the Tenth Circuit has twice rejected tort claims against government officials arising out of injuries sustained while mountain climbing on public lands. *See Kiehn*, 984 F.2d at 1106 (no duty to warn people that scaling sandstone cliffs in Dinosaur National Monument may be dangerous); *Johnson*, 949 F.2d at 337 (National Park Service had no duty to regulate mountain climbing in Grand Teton National Park). *See also Beach*, 726 P.2d at 415 (college officials owe no duty to college students participating in extracurricular activities absent a special relationship between the parties). Since colleges do not assume responsibility for safety of college students on extracurricular, off-campus outings, nor do they deprive students of their normal opportunities for self-protection, no duty is owed and there can be no negligence liability. *See* Restatement (Second) of Torts § 314(A) (1964).

The court's finding of no duty is not altered by application of the state-created-danger doctrine. The court has already concluded that the alleged facts do not amount to a state-created-danger; hence, nothing any of the defendants did created an unreasonable risk of causing physical harm to decedent and no act of any of the defendants was sufficient to create a duty on defendants' part to protect the plaintiff from the obvious risks of rock climbing.

Without a duty, there can be no breach and no negligence liability. Accordingly, plaintiffs negligence claims must fail and defendants' motion to dismiss that claim is hereby granted. In addition, as more fully explained in the court's analysis of the Utah Governmental Immunity Act below, plaintiff's negligence claim against these individual defendants is also barred by application of that Act.

**Application of the Utah Governmental Immunity Act.**

 Finally, the court will address defendants' argument that plaintiffs state law claims are barred by the Utah Governmental Immunity Act (the "Act"). Section 63–30–4 of the Utah Governmental Immunity Act provides:

> [a]n employee may be joined in an action against a governmental entity in a representative capacity if the act or omission complained of is one for which the governmental entity may be liable, but no employee may be held personally liable for acts or omissions occurring during the performance of the employee's duties, within the scope of employment, or under color of authority, unless it is

established that the employee acted or failed to act due to fraud or malice. Utah Code Ann. § 63–30–4(4) (1995)..

Plaintiffs' initial response to defendants' urging that the Act bars plaintiffs' pendent state law claims is that "the State of Utah has waived immunity on plaintiffs' claims against defendant Huddleston for breach of an implied contract to conduct student activities in a reasonably safe environment." Defs.Opp. at 43. The court is admittedly puzzled by plaintiffs' reference to a contract claim. As already noted, the complaint is void of any allegation that a contractual relationship existed between plaintiffs and defendants. Nor can the court infer the existence of any of the elements of a contract claim from the facts plead. Furthermore, no facts have been plead to establish liability of any individual defendant under an implied-in-fact contract theory. There simply was no contractual relationship of any kind between these defendants and plaintiffs and such a theory cannot form the basis for any alleged waiver of immunity under Utah Code Ann. 63–30–5 (1989).

Plaintiffs next argue the complaint alleges defendants acted "willfully, wantonly, intentionally, recklessly and with deliberate indifference" so the claims establish waiver under Utah Code Ann. § 63–30–4(4). The court cannot state the proper analysis of this claim better than defendants:

> In this instance, plaintiffs' make *conclusory* allegations that defendants intentionally, recklessly and with deliberate indifference chose the location for the Sandblast party, failed to supervise, and failed to warn. [Complaint, para. 20.]. However, plaintiffs' fail to allege. any *well-pleaded facts* that defendants acted with "malice", i.e., that defendants acted with any "ill will" toward Mr. Apffel. *See Manuel v. State*, 344 So.2d 1317, 1319 (Fla.Dist.Ct.App.1977) (reasoning that an act is done with "malice" if it is

done from ill will, hatred, spite, or an evil intent). Thus, plaintiffs' claims are barred under the Utah Governmental Immunity Act and should be dismissed. Defs. Memorandum in Support at 18, including reference to footnote 11, not cited herein. There are no facts in the complaint from which the court can conclude or reasonably infer that defendants intended to harm Jason Apffel or acted so deliberately indifferent that such a result was unavoidable. Furthermore, plaintiffs have not attempted to cite any cases which are helpful or analogous.

Finally, because the court has already concluded that the dangerous condition which resulted in the death of Jason Apffel was the naturally occurring sandstone cliffs, rather than the act of planning a party in their vicinity, Utah Code Ann. § 63–30–10(11) (1991) provides defendants another basis for immunity from plaintiffs' claims.[2]

Accordingly, for the reasons discussed by the court in this memorandum decision, and more fully briefed in defendants' memoranda which are incorporated in the court's opinion by this reference, the defendants' motion to dismiss is granted.

So Ordered.

---

**2.** Governmental entities are immune from suit for injuries arising out of "any natural condition on publicly owned or controlled lands." Utah Code Ann. § 63–30–10(11)(1991).